**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF KENTUCKY – (Covington)**

| | | |
|---|---|---|
| **JOSEPH FISCHER, et. al.** | : | Case No.: 2:22-cv-121-WOB |
| Plaintiffs | : | |
| v. | : | |
| **HON. KAREN THOMAS**, et. al. | : | |
| Defendants | : | |

## PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER, WITH VERIFIED COMPLAINT IN SUPPORT AND REQUEST FOR A PRELIMINARY INJUNCTION

Plaintiffs Joseph Fischer and the Fischer for Supreme Court Committee, respectfully request a temporary restraining order be issued on their behalf, pursuant to FRCP 65, which permits them in the course of a pending judicial campaign that is going to take place November 8, 2022 to engage in certain protected speech between now and that general election, as well as to preclude the initiation of formal proceedings against the Plaintiff based on Plaintiffs' First Amendment protected speech.  Because of the pendency of that election, and the critical election-related speech that occurs in the next month, emergency relief is warranted.

Plaintiffs also seek a preliminary injunction, on the same grounds.  The issues, as the Memorandum below demonstrates, are straight forward: Defendants seek to restrain speech in the course of a judicial election campaign that both the United States Supreme Court, Sixth Circuit, and this Court have all determined are plainly protected.  A Memorandum in Support is attached hereto, and a proposed order has been tendered.

1

Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com

/s/Thomas B. Bruns
Thomas Bruns (KBA 84985)
Bruns, Connell, Vollmar & Armstrong, LLC
4555 Lake Forest Drive, Suite 330
Cincinnati, OH 45242
513-312-9890
tbruns@bcvalaw.com
*Attorneys for Plaintiffs*

## CERTIFICATION UNDER FRCP 65

Pursuant to FRCP 65(b)(1)(A), the Temporary Restraining Order, precluding Defendants from enforcing their interpretation of the Kentucky Code of Judicial Conduct related to campaign speech, infringing upon the rights of the Plaintiffs, should be granted without notice because the rights involved are irreparable, as explained in the attached Memorandum in Support and Verified Complaint, these matters are occurring in the midst of a campaign; Defendants, through Counsel, were given notice of this filing prior to it by and through a telephone call to their Counsel, and were served with this Motion by e-mail. Given time constraints and the significant consequences to these Plaintiffs at stake, additional notice was not feasible.

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)

## MEMORANDUM IN SUPPORT

### I.      FACTS

#### The Parties

Plaintiff, Joseph Fischer, was a resident of Campbell County, Kentucky, and was and is a candidate for Kentucky Supreme Court, 6th District for the November, 2022 election, covering counties in Northern Kentucky.  (Pl.'s Ver. Compl., DE#1, ¶2).  Defendants Hon. Karen Thomas, R. Michael Sullivan, Hon. Eddy Coleman, Hon. Jeff S. Taylor, Hon. Joe E. Ellis, and Hon. Janet Lively McCauley are members of the Judicial Conduct Commission (collectively they are denoted in this Complaint as the "JCC"), who are all sued in their official capacities. *Id.* Defendant Jimmy Shaffer is the Executive Secretary of the JCC.  *Id.*  The JCC is responsible for, among other things, enforcement of the Kentucky Code of Judicial Conduct, and associated rules, as well as rules for the processing of complaints.  *Id.*  The JCC accepts complaints from the public.  *Id.*  For the avoidance of doubt, the JCC does actively enforce, and threatens to enforce, the Kentucky Code of Judicial Conduct.  *Id.*

#### Facts underlying the claims

In 2022, Mr. Fischer was and is a candidate for Kentucky Supreme Court, for the 6th Supreme Court District, which covers a number of Northern Kentucky counties.  (Pl.'s Ver. Compl., DE#1, ¶7).

Mr. Fischer is a lifelong Republican, who has served as a Republican member of the Kentucky House of Representatives for more than two decades.  (Pl.'s Ver. Compl., DE#1, ¶8). His affiliation with, support of, and alignment with, the Republican party is longstanding and well-known..  *Id.*  The Sixth Kentucky Supreme Court District is largely Republican and it is becoming more and more Republican over time.  (Pl.'s Ver. Compl., DE#1, ¶9).

Mr. Fischer's opponent, the incumbent Supreme Court Justice, Justice Michelle Keller, is a lifelong Democrat, was appointed by Democratic Governor Beshear, but who, since her appointment, has changed her registration to independent.  (Pl.'s Ver. Compl., DE#1, ¶10).  Most of Justice Keller's donors are registered Democrats, including prominent Democrats, such as former Governor Steve Beshear and his wife, Jane.[1]  (Pl.'s Ver. Compl., DE#1, ¶11).  Almost all of the people endorsing Justice Keller are registered Democrats.[2]  (Pl.'s Ver. Compl., DE#1, ¶12).

Earlier this year, Mr. Fischer inquired of the Judicial Ethics Opinion for certain advice on his campaign activities, including his affiliation with the Republican Party, and that body issued an opinion, JE 130.[3]  (Pl.'s Ver. Compl., DE#1, ¶13).  Among other things, that opinion answered the following question in the negative: "May a judicial campaign committee's advertising include symbols closely associated with a political party in its advertising (i.e., democratic – donkey & republican – elephant)?  No."  *Id.*  Allegedly doing so would "render hollow" the non-partisan nature of the judicial elections.  *Id.*

Mr. Fischer and his campaign have not been shy about his Republican party affiliation, and his campaign materials generally denote: "Joe Fischer for Kentucky Supreme Court --- the Conservative Republican."  (Pl.'s Ver. Compl., DE#1, ¶14).  He has never, however, expressly indicated that he is the nominee of the Republican party.  *Id.*  At times, he has utilized the following image, to include a generic elephant, in his campaign materials:

---

[1] See http://kref.ky.gov (last visited 10/3/2022)
[2] https://www.kellerforkentucky.com/endorsements.html (last visited 10/3/2022).
[3] https://kycourts.gov/Courts/Judicial-Ethics/Judicial%20Ethics%20Opinions/JE_130.pdf (last visited 10/3/2022).



*Id.*

In light of JE Opinion JE 130, Mr. Fischer used a generic elephant instead of the Republican elephant. (Pl.'s Ver. Compl., DE#1, ¶15).  But for that opinion, and the JCC's general threat of enforcement, he would have used the Republican Elephant symbol (and still would/will do so but for that threat of enforcement):

 *Id.*

Mr. Fischer has obtained, and is now using in campaign materials, endorsements from both Kentucky Right to Life and Northern Kentucky Right to Life.  (Pl.'s Ver. Compl., DE#1, ¶16).  He has long involvement with both organizations and, as a sitting state legislator, he sponsored certain pro-life legislation.  *Id.*

Those organizations have taken issue with his opponent, Justice Keller, in part for her approval of abortions for out-of-state minors without their parents' knowledge or consent, while she sat on the Kentucky Court of Appeals.[4]  (Pl.'s Ver. Compl., DE#1, ¶17).

For the avoidance of all doubt, Right to Life groups, including Kentucky Right to Life and Northern Kentucky Right to Life, in addition to their endorsements, are actively supporting

---

[4] https://www.cincinnati.com/story/news/politics/2014/10/27/abortion-issue-divides-supreme-court-candidates-gop/18000733/ (last visited 10/3/2022).

Mr. Fischer's campaign, including through word-of-mouth endorsements.  (Pl.'s Ver. Compl., DE#1, ¶18).  Equally, right to life supporters have been actively engaged in a sign campaign for candidates that they support, putting up both the candidate's sign, and their own "Choose Life" signs with it.  *Id.*  An example of this is:



*Id.*

Insofar as these "Choose Life" signs are concerned, Mr. Fischer and his campaign team have not erected them or put them up; supporters of third party Right to Life groups have.  (Pl.'s Ver. Compl., DE#1, ¶19).  That said, Mr. Fischer has not been shy about his endorsements from Kentucky Right to Life or Northern Kentucky Right to Life and shared a photo of one of them on his campaign Facebook page.  *Id.*

For the avoidance of all doubt, Mr. Fischer has <u>never</u>, in the course of his campaign, made a promise or pledge to rule a particular way regarding any particular party, particular case, or particular controversy.  (Pl.'s Ver. Compl., DE#1, ¶20).

In fact, when an individual questioned Mr. Fischer on his Facebook about his past and present affiliations with Right to Life groups, this was his response (and is consistent with how he has generally addressed questions about particular cases or parties):



(Pl.'s Ver. Compl., DE#1, ¶21).

Mr. Fischer has, however, made general statements about issues, has made broad pledges about his commitment to defending the rule of law, ensuring Kentucky's judicial system effectively serves all citizens of the Commonwealth, has indicated that he will not engage in judicial activism, and has underscored his understanding of the importance of the separation of powers in that it is the duty and responsibility of the legislature to make the laws, the executive to enforce the laws, and the judiciary to interpret the laws.  (Pl.'s Ver. Compl., DE#1, ¶22).

Mr. Fischer has received the endorsement of various county Republican Party Executive Committees (and partisan elected officials) from within the 6th Supreme Court District, and in the context of his campaign he has appeared before various community and political groups to speak about his platform and qualifications, including attending certain Republican Party events on his

own behalf,[5] but he has not used or sought the endorsements of the Republican Party or partisan

elected officials in his campaign or any of his campaign materials, or in any of his public

statements.  (Pl.'s Ver. Compl., DE#1, ¶23).  Mr. Fischer has made general references to his

having served two decades in the Kentucky House of Representatives, and it is common

knowledge that he was a Republican member of that body.  *Id.*

On September 27, 2022, the Kentucky JCC penned a letter to Mr. Fischer.  A true and

accurate copy of that letter was attached as **Exhibit A** to the Plaintiffs' Complaint.  (Pl.'s Ver.

Compl., DE#1, ¶24).  In it, the JCC observed that it received complaints from third parties,

indicated that under SCR 4.170(1) it found that "following consideration and discussion" of the

complaints "there is a basis for investigation of a matter" within its jurisdiction, and it directed

Mr. Fischer to respond.  In other words, someone lodged a complaint regarding conduct that the

JCC determined is a probable violation of the Kentucky Code of Judicial Conduct.  *Id.*

The JCC specifically made allegations that Mr. Fischer and his speech violated Kentucky

Judicial Canon 4.  (Pl.'s Ver. Compl., DE#1, ¶24).  More specifically, the JCC's September 27,

2022 letter, made an allegation of a Rule 4.1(A)(6) violation, which provides "a judge or judicial

candidate shall not… (6) publicly identify himself or herself as a nominee of a political

organization."  (Pl.'s Ver. Compl., DE#1, ¶25).

The JCC thusly interprets Mr. Fischer's usage of signage that indicates that he is "the

conservative Republican" in the race, as well as his use of a generic elephant in his campaign

materials, to violate that Rule 4.1(A)(6).  (Pl.'s Ver. Compl., DE#1, ¶26).

---

[5] In the same vein, his opponent, Justice Michelle Keller, has appeared before similar groups.  Justice Keller, for instance, has given speeches to Emerge Kentucky, a Democratic Women's candidate incubation organization, and she has likewise appeared at events sponsored by both the Democratic and Republican parties.  *Id.*

Further, the JCC's September 27, 2022 letter, likewise made an allegation of a Rule 4.1(A)(7) violation, which provides "a judge or judicial candidate shall not… (7) seek, accept, or use endorsements from a political organization;" (Pl.'s Ver. Compl., DE#1, ¶27).  The JCC thusly interprets Mr. Fischer's usage of signage that indicates that he is "the conservative Republican" and his failure to disavow[6] endorsements he has received (but not sought or himself used) from Republican executive committees to be violative of that Rule 4.1(A)(7).  (Pl.'s Ver. Compl., DE#1, ¶28).

Further, the JCC's September 27, 2022 letter, made an allegation of a Rule 4.1(A)(13) violation, which provides "a judge or judicial candidate shall not… (13) in connection with cases, controversies, or issues that are likely to come before the court, make pledges, promises, or commitments that are inconsistent with the impartial* performance of the adjudicative duties of judicial office."  (Pl.'s Ver. Compl., DE#1, ¶29).

The JCC thusly interprets Mr. Fischer's usage of signage that indicates that he is "the conservative Republican," his affiliation with Kentucky Right to Life and Northern Kentucky Right to Life and sharing the fact of their endorsements, and third parties putting up "Choose Life" signs with his campaign signs to be violative of that Rule 4.1(A)(13).  (Pl.'s Ver. Compl., DE#1, ¶30).

On October 3, 2022, the undersigned Counsel sent correspondence to the Kentucky Judicial Conduct Commission.  (Pl.'s Ver. Compl., DE#1, ¶31).  A true and accurate copy of that letter was attached as **Exhibit B** to the Verified Complaint.  *Id.*  Among other things, that correspondence outlined, generally, the speech Mr. Fischer engaged in, as outlined in the

---

[6] This is particularly curious in light of the commentary to the Rule in question that indicates that a candidate does not have to disavow an endorsement to avoid the "accepting" provision.

Verified Complaint.  *Id.*  It referenced the probable cause finding by the JCC, as to violations it was alleging in light of that conduct, and asked the JCC to outline any additional speech Mr. Fischer engaged in, that the JCC found as a violation, by 4:00 p.m. on October 4, 2022.  *Id.*  The JCC did not respond, confirming that the aforementioned speech constituted the basis of the complaints and action by the JCC.  *Id.*

At present, Mr. Fischer faces threat of imminent enforcement action by the JCC for this First Amendment protected campaign related speech.  (Pl.'s Ver. Compl., DE#1, ¶32).  However, at the present time, no formal action has been commenced by the JCC, and no formal charges have been filed against Mr. Fischer under S.C.R. 4.180.  (Pl.'s Ver. Compl., DE#1, ¶33).  Thus, no action is "pending" in state court, since no formal charges have been filed.  *Id.*

Unless enjoined, all Defendants herein will continue to enforce Canon 4 of the Kentucky Code of Judicial Conduct and Rules 4.1(A)(6), 4.1(A)(7), and 4.1(A)(13) in a manner that is in contravention of Plaintiffs' First Amendment Rights.  (Pl.'s Ver. Compl., DE#1, ¶34).

## II.    LAW AND ARGUMENT

### A.  Standard

When deciding whether to issue a temporary restraining order or preliminary injunction, the court must consider the following four factors: (1) Whether the movant has demonstrated a strong likelihood of success on the merits; (2) Whether the movant would suffer irreparable harm; (3) Whether issuance would cause substantial harm to others; and (4) Whether the public interest would be served by issuance.  *Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998); *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).   These "are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

Clear Sixth Circuit law establishes that the remaining factors are met where constitutional rights are infringed upon, and so, in these cases, the likelihood of success factor is dispositive. *H.D.V. - Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009) (abuse of discretion not to grant preliminary injunction where constitutional violation found); *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (irreparable harm from violation of rights); *Foster v. Dilger*, 2010 U.S. Dist. LEXIS 95195 (EDKY 2010) (no substantial harm to others, even where registry incurred printing costs, where constitutional rights at stake); *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *see also G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1999) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). *See, also, Elrod v. Burns*, 427 U. S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). We thus primarily focus, below, on the likelihood of success on the merits.

### B. Law and Argument

Before addressing the substance of these challenges, two preliminary points must be made: it was perhaps possible to provide a constitutional construction of the challenged Canon and Rules. Defendants rejected that approach and chose the opposite course of action. "After all, the law of the Commonwealth is theirs to interpret." *Winter v. Wolnitzek*, 186 F. Supp. 3d 673, 686 (EDKY 2016), *overruled on other grounds* in *Winter v. Wolnitzek*, 834 F.3d 681 (6th Cir. 2016). "If they say that under Kentucky law 'arson' means 'whale hunting,' then whale hunting is what arson means." *Id.* Second, we have raised both facial and as-applied challenges. A facial challenge to a law's constitutionality is an effort "to invalidate the law in each of its

11

applications, to take the law off the books completely." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir 2009) (en banc).  Where a plaintiff makes a facial challenge under the First Amendment to a statute's constitutionality, the "facial challenge" is an "overbreadth challenge." *Connection Distrib. Co.*, 557 F.3d at 335.  And a Plaintiff must demonstrate that "a 'substantial number of instances exist in which the law cannot be applied constitutionally." *Glenn v. Holder*, 690 F.3d 417, 422 (6th Cir. 2012).

In the as-applied context, the showing is "easier."  *Winter*, 834 F.3d 681, 687.  All that a Plaintiff must do is set forth the protected speech that he has engaged in or intends to engage in, and show that the particular speech at issue is protected under the First Amendment.  *Id.*

### 1.  Rule 4.1(A)(6), as interpreted by Defendants, violates the First Amendment

Rule 4.1(A)(6) provides, in relevant part, "a judge or a judicial candidate* shall not (6) publicly identify himself or herself as a nominee of a political organization."  According to the JCC, the interpretation of this Rule extends to Mr. Fischer's truthful statements that he is "the Conservative Republican."  (Pl.'s Ver. Compl., DE#1, ¶¶14, 15, 26).  Mr. Fischer has never, however, expressly indicated that he is the nominee of the Republican party.  *Id.*  The JCC has further interpreted this rule to extend to Mr. Fischer's use of a generic elephant.  *Id.*

We do not bring this case with a blank slate.  Before this Court and the Sixth Circuit in 2014 through 2016, the Defendants, and the Kentucky Supreme Court, engaged in a concerted effort to restrict similar speech.  In those cases, the Kentucky Supreme Court certified the law, and indicated that the then-existing party affiliation Canon effectively prohibited a candidate from indicating he or she was the nominee of a particular party.  *Blau v. Wolnitzek*, 482 S.W.3d 768 (Ky. 2016).  But it did not merely extend that restriction to express representations by candidates of being the nominee: it included within its ambit expressions of being the nominee

12

"by implication." *Id.* In *Blau*, the Kentucky Supreme Court was clear about its view: it viewed campaigning with terms such as "the conservative Republican" or "the Republican" as indicating, at least by implication, that someone was the official nominee of the Republican party. *Id.* In light of the correspondence from Defendants directed to Mr. Fischer, there is no reason to believe that this improper interpretation is not still the case or that it does not extend to Rule 4.1(A)(6). (Pl.'s Ver. Compl., DE#1, ¶¶24-31).

In 2016, analyzing a similar judicial restriction on speech, Judge Thapar, then on this Court, began by observing that a "law is vague if it 'fails to provide fair notice to those to whom it is directed.'" *Winter*, 186 F. Supp. 3d 673, 685, *citing Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048 (1991). He then observed that "[t]o determine whether a law provides such notice, the test in most contexts is whether a law 'give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Id.*, *citing Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). But he then correctly observed that:

> In the free-speech context, however, the "standards of permissible statutory vagueness" are even stricter. *NAACP v. Button*, 371 U.S. 415, 433, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963). The freedom of speech is "delicate and vulnerable, as well as supremely precious in our society . . . [and] the threat of sanctions may deter [speech] almost as potently as the actual application of sanctions." *Id.* A content-based regulation is therefore not narrowly tailored—i.e., it is unconstitutional—if it is too vague. See *City of Houston, Tex. v. Hill*, 482 U.S. 451, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987); see also *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997). "The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno*, 521 U.S. at 871-72.
>
> Moreover, vague laws give authorities discretion to enforce the law against one speaker but not others, thus creating the "risk of discriminatory enforcement." *Id.* at 872 (citing *Denver Area Ed. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727 (1996)). "Such discretion is particularly repugnant given the eternal temptation . . . to arrest the speaker rather than to correct the conditions about which he complains." *Hill*, 482 U.S. at 465 n.15 (internal quotation marks omitted). In short, "First Amendment freedoms need breathing space to survive," and thus the "government may regulate in the [free-speech] area only with narrow specificity." *Id.* at 433 (citation omitted).

In analyzing whether a canon that precluded someone from campaigning as a member of a political organization was unconstitutionally vague under the foregoing standards, Judge Thapar wrote, "[i]f the only thing the Canon forbid was a candidate saying that he is a party's official nominee, then it would likely be constitutional." *Winter*, 186 F. Supp. 3d 673, 686. He continued: "[a]fter all, Kentucky has a compelling interest in promoting non-partisan elections." *Id.* But then he turned to the broader Kentucky Supreme Court's interpretation, which Defendants again utilize here, continuing:

> A candidate violates the Canon, the Court held, when he says that he is "the" Republican candidate, that he is "the Conservative Republican" candidate, that his opponent is "the" Democratic candidate, or that his opponent is "the Liberal Democrat" candidate. *Id.* at 15-16. According to the state court, each of these statements implies that the Republican or Democratic parties had formally nominated a certain candidate. A candidate apparently does not violate the canon, however, when he says that he is "the only" Republican or that his opponent is "the only" Democrat. Each of those statements, the Kentucky Supreme Court held, implies nothing about whether a given party had nominated a given candidate. Id. After discussing these specific factual settings, the Kentucky Supreme Court concluded that the Canon forbids candidates to "portray themselves, either directly or by implication, as the official nominee of a political party." *Id.* at 16.

Judge Thapar then observed that this indirect interpretation and including within its reach any implication of a nomination made the Canon unconstitutionally vague. *Id.* at 685-687. He observed that:

> A professional linguist would struggle to determine exactly what it means to "portray" one's self as an official nominee "by implication." And a "person of ordinary intelligence?" Good luck to him. For example, could a candidate say "Republicans support my candidacy?" Could he say "the Republican leadership has endorsed me?" Could he say "the Republican party wants me to be elected?" Are these statements more like "affiliating" with the Republican party (which the Canon apparently permits) or more like "implying" that one is the party's official nominee (which the Canon apparently forbids)? This Court confesses that it does not know the answer to that question. *Id.* at 686.

Those observations are equally true with Rule 4.1(A)(6).  As Judge Thapar concluded:
"With this Canon hanging above him, in Damoclean fashion, a candidate would need to be
courageous indeed to say anything at all about his political affiliation."  *Id.*

Chief Judge Sutton, writing for the Sixth Circuit panel, found that Judge Tharpar "rightly
struck it in its entirety."  *Winter*, 834 F.3d 681, 688-689.  That Court then echoed Judge Thapar's
analysis.  *Id.*  It found that any interpretation that included not merely the express false
representation of being the nominee (which Mr. Fischer has never done, *see* Complaint, DE#1, at
¶14), but extending that interpretation to anything that implied someone was the nomination by
stating, for instance, that they were "the conservative Republican," rendered the rule
unconstitutionally vague.  *Winter*, 834 F.3d 681, 688-689.  Well, that is exactly what Defendants
and Rule 4.1(A)(6) have done yet again.  It is unclear what could be within this "nominee by
implication" theory advanced by Defendants and the Kentucky Supreme Court, for all of the
reasons that this Court expressed in *Winter*, 186 F. Supp.3d 673, 686, which Chief Judge Sutton
echoed in *Winter*, 834 F.3d 681, 688-689.

Mr. Fischer's use of the term "the conservative Republican" and his use of the elephant in
his materials are (Complaint, DE#1, at ¶¶ 14, 15, 26), which are merely shorthanded ways of his
denoting his affiliation with the Republican party are, all of which are plainly protected speech.
*Carey v. Wolnitzek*, 614 F.3d 189 (6th Cir. 2010); *Republican Party of Minn. v. White*, 536 U.S.
765 (2002).

Further, and even putting vagueness considerations aside, this Canon, as interpreted, must
run the gauntlet of strict scrutiny.  *Winter*, 834 F.3d 681, 690.  The Sixth Circuit has held that a
judicial candidate has a right—a constitutional right—to tell the voters that a given party is his
party, *Carey*, 614 F.3d at 201.  Forcing a candidate to forgo speech that denotes he or she is "the

15

conservative Republican" or to forgo usage of the party's symbol is of a piece with this right. And, put simply, this restriction is both under-inclusive and overly broad as applied. It is overly broad because candidates have a right to denote their affiliation, and iterations of that, such as denoting that they are the most conservative Republican, or the moderate Republican, are merely iterations of the same affiliation clause that they have a right to express.

True, the Commonwealth has an interest in running a non-partisan election, but no amount of speech changes the fact that when voters go into the booth party affiliations are not contained on the ballot itself. And, equally, candidates are not permitted to actually be nominated by the parties. It is also overly broad because a prohibition on expressly indicating someone is the nominee is sufficient to vindicate the Commonwealth's alleged interest.

Moreover, *Carey* was clear that "[a] party platform after all is nothing more than an aggregation of political and legal positions, a shorthand way of announcing one's views on many topics of the day." *Id.* at 202. And candidates had an absolute right to express their affiliation. Restricting a candidate's ability to make the point that he or she is "the conservative Republican" is consistent with the protected rights in *Carey*. The same is true with respect to usage of the party label: it indicates affiliation, not that someone is the nominee, and any broader extension raises the vagueness concerns articulated by this Court and the Sixth Circuit in *Winter*, 186 F. Supp. 3d 673, 685-687 and *Winter*, 834 F.3d 681, 690.

Rule 4.1(A)(6) is unconstitutional, both facially, and as applied.

### 2.   Rule 4.1(A)(7), as interpreted by Defendants, violates the First Amendment

Rule 4.1(A)(7) provides, in relevant part, "a judge or a judicial candidate* shall not (7) seek, accept, or use endorsements from a political organization." The JCC interprets Mr. Fischer's usage of signage that indicates that he is "the conservative Republican" and his failure

to disavow endorsements he has received (but not sought or himself used or sought) from Republican executive committees to be violative of that Rule 4.1(A)(7).  (Pl.'s Ver. Compl., DE#1, ¶28).  For the same reason that Rule 4.1(A)(6) is unconstitutionally vague, application and extension of Rule 4.1(A)(7) to speech by a candidate as "the conservative Republican" is likewise both unconstitutionally vague, and fails to satisfy strict scrutiny.  We note that this Court and the Sixth Circuit decried this "endorsement by implication" theory through the usage of "the conservative Republican" which Defendants again attempt to utilize here, in both *Winter*, 186 F. Supp. 3d 673, 685-687 and *Winter*, 834 F.3d 681, 690.  Here we are again.  Such a restriction was unconstitutionally vague then, and remain so now.

That then turns us to the second aspect of the application of this rule by Defendants: the purported need to disavow endorsements a candidate has received, but has not either sought or used.  The "accept" clause.  First, this "accept" language is vague, particularly in light of Comment 10 to the Rule provided by the Kentucky Supreme Court: "A judge or judicial candidate is not required to disavow an endorsement to avoid being deemed to have accepted it." This "gotcha" is at the heart of what a vagueness challenge is meant to protect against.  *Winter*, 186 F. Supp. 3d 673, 685-687.

But going further, this effort to require a disclaimer is a form of compelled speech, and the Sixth Circuit has held that such requirements must also run the gauntlet of strict scrutiny. *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 315-316 (6th Cir. 1998).  Such a disclaimer, particularly in these instances, provides a particularly troublesome "Damoclean" problem for candidates such as Mr. Fischer.  *Winter*, 186 F. Supp.3d 673, 686.  That is because he has the right to announce his affiliation with the Republican party.  *Carey*, 614 F.3d at 201.

And there is a due process problem with this as well: is Mr. Fischer supposed to police every third-party who might endorse him in the context of an active election?

We acknowledge of course, the fact that Kentucky has an interest in non-partisan elections, and in the prevention of *quid pro quo* corruption. *Winter*, 834 F.3d 681, 690. But a forced disclaimer, based on third-party speech, does not, and cannot meet this requirement. As in *Toledo Area AFL-CIO Council*, such a disclaimer requirement "undermines the effectiveness of the accompanying political speech" of Mr. Fischer's association with the Republican party. 154 F.3d 307 at 315. And, as in *Toledo Area AFL-CIO Council*, there are less restrictive means than some type of disclaimer or disavowment of third-party endorsements, such a general requirement by the candidate to remind voters that the election is non-partisan that Kentucky could have, but did not pursue.

Rule 4.1(A)(7), as construed by Defendants, is, therefore, unconstitutional both facially and as-applied to Mr. Fischer's speech.

### 3. Rule 4.1(A)(13), as interpreted by Defendants, violates the First Amendment

Rule 4.1(A)(13) provides, in relevant part, "a judge or a judicial candidate* shall not (13) in connection with cases, controversies, or issues that are likely to come before the court, make pledges, promises, or commitments that are inconsistent with the impartial* performance of the adjudicative duties of judicial office." (Pl.'s Ver. Compl., DE#1, ¶29).

The JCC thusly interprets Mr. Fischer's usage of signage that indicates that he is "the conservative Republican," his affiliation with, Kentucky Right to Life and Northern Kentucky Right to Life and sharing the fact of their endorsements, and third parties putting up "Choose Life" signs with his campaign signs to be violative of that Rule 4.1(A)(13). (Pl.'s Ver. Compl., DE#1, ¶30). First, "the conservative Republican" issue is subsumed in the prior discussion – that

18

is protected speech, well within the ambit and discussion of *Winter*, 186 F. Supp. 3d 673, 685-687 and *Winter*, 834 F.3d 681, 690 – presenting both narrow tailoring and vagueness problems, as discussed above.  Which leaves the Pro-Life affiliations and associations.

The Supreme Court addressed the ability of a judicial candidate to speak about issues in *Republican Party of Minn. v. White*, 536 U.S. 765 (2002).  There, the candidate "distributed literature criticizing several Minnesota Supreme Court decisions on issues such as crime, welfare, and abortion."  *Id.* at 768.  As here, a complaint was filed.  *Id.*  A narrowing construction was provided by the District Court in that case, indicating that a candidate could only be punished for announcing his views on issues likely to come before the Court.  *Id.* at 771. The Supreme Court likewise observed that every disputed issue of the day could foreseeably come before a Court, particularly a state Supreme Court.  *Id.* at 772.  And the Supreme Court observed that discussions of general judicial philosophy in the context of a campaign "has little meaningful content for the electorate unless it is exemplified by application to a particular issue of construction likely to come before a court."  *Id.* at 773.

The Supreme Court applied strict scrutiny to these content-based restrictions.  *Id.* at 774. Measured against asserted state interests of impartiality and its appearance, the Supreme Court held that restrictions on judicial candidates discussing hot button issues, even those likely to come before the Court, could not be sustained.  *Id.* at 775.  First, as to asserted state interests of impartiality, the Supreme Court held there was no state interest in impartiality as to issues, only as to particular parties or controversies.  *Id.* at 775-778.  And, as to impartiality as to parties, preventing candidates from speaking about issues, even those likely to come before the Court, was not furthered by an issue-based gag order.  *Id.*  The Supreme Court then gave examples about why the issue-gag rule was both underinclusive and overbroad:

The short of the matter is this: In Minnesota, a candidate for judicial office may not say "I think it is constitutional for the legislature to prohibit same-sex marriages." He may say the very same thing, however, up until the very day before he declares himself a candidate, and may say it repeatedly (until litigation is pending) after he is elected.
…
Moreover, the notion that the special context of electioneering justifies an abridgment of the right to speak out on disputed issues sets our First Amendment jurisprudence on its head. "Debate on the qualifications of candidates" is "at the core of our electoral process and of the First Amendment freedoms," not at the edges…. "It is simply not the function of government to select which issues are worth discussing or debating in the course of a political campaign."  We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election.  *Id.* at 779-782.

The Supreme Court then observed that: "[t]here is an obvious tension between the article of Minnesota's popularly approved Constitution which provides that judges shall be elected, and the Minnesota Supreme Court's announce clause which places most subjects of interest to the voters off limits." *Id.* at 787.  And further observed that: "the First Amendment does not permit it to achieve its goal by leaving the principle of elections in place while preventing candidates from discussing what the elections are about." *Id.* at 788.  Indeed, "[t]he greater power to dispense with elections altogether does not include the lesser power to conduct elections under conditions of state-imposed voter ignorance." *Id.*  "If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process . . . the First Amendment rights that attach to their roles." *Id.*  Thus, a "canon of judicial conduct prohibiting candidates for judicial election from announcing their views on disputed legal and political issues violates the First Amendment." *Id.*

The Sixth Circuit addressed the discussion of issues and commitments from judicial candidates in *Carey*, 614 F.3d 189.  There, Judge Sutton again talked about the overbreadth and "unmooring" the prohibition from making case-specific pledges or promises, something he denoted as "party-specific connotations," versus the discussion of "issues" that may come before the court. *Id.* at 207.  Judge Sutton distinguished "express . . . commitments" on particular cases,

which the Defendants could regulate, with making commitments about "issues," which they

cannot. *Id.* In *Carey*, Judge Sutton expressed a narrow form of prohibition on issue

commitments that states could regulate, for instance, a candidate discussing and committing to

keeping an unbroken chain of rape conviction affirmances, suggesting that the commitment then

becomes not about issues, but instead about parties. *Id.* at 208. Ultimately, the Sixth Circuit in

*Carey* did not address the constitutionality of the canon, because there was a dispute about its

reach, and it remanded to the District Court to flesh that issue out. *Id.*

Again in *Winter*, 834 F.3d 681, 694-695 the Sixth Circuit remanded, because what

commitments were with respect to "issues" that were inconsistent with impartiality was unclear

(vague even). *Id.* The Sixth Circuit in *Winter* gave Defendants the benefit of the doubt with a

remand, with the assumption that they would act "sensibly" and adopt a narrow and

constitutional construction (one they abandon here). *Id.* at 695. Well, so much for *that*

assumption. We now know that they have done no such thing, and have tread into the

unconstitutional side of the line.

Turning to the present matter, a few observations are in order. First, Mr. Fischer and his

campaign have <u>never</u> made an express commitment to rule for a particular party or rule in a

particular way in a particular case. (Complaint, DE#1, ¶20). Second, Mr. Fischer has repeatedly

indicated that he is pro-life and that he is endorsed by pro-life groups. (Complaint, DE#1, ¶¶ 16-

20). And, for context, those groups have been involved in putting up his signs, along with their

own "Choose Life" signs. (Pl.'s Ver. Compl., DE#1, ¶19). Third, Mr. Fischer has made general

commitments to include "broad pledges about his commitment to defending the rule of law,

ensuring Kentucky's judicial system effectively serves all citizens of the Commonwealth, has

indicated that he will not engage in judicial activism, and has underscored his understanding of

21

the importance of the separation of powers in that it is the duty and responsibility of the legislature to make the laws, the executive to enforce the laws, and the judiciary to interpret the laws." (*Id.* at ¶22). And fourth, when questioned about particular rulings on particular cases, in light of his pro-life stances and affiliations, Mr. Fischer has abjured from making particular promises about particular cases and parties, and instead promised to put personal views aside and decide cases "based on the law as written." (*Id.* at ¶21).

Plainly, this is the type of issue discussion and affiliation that is clearly on the First Amendment protected side of the line under *White*, 536 U.S. 765 at 771-782, 787-788, *Carey*, 614 F.3d 189 at 207-208, and *Winter*, 834 F.3d 681, 694-695. It is divorced from any party, future party, case or controversy and Mr. Fischer has never made a commitment that he would rule a particular way insofar as a party, case, or controversy is concerned.

We suspect that Defendants will respond that, following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), the issue of abortion is now thrust into the state courts (Kentucky being no exception), and, just as federal courts have wrestled with the contours of the purported right to an abortion (or whether it even exists) for decades, those disputes are now occurring in the state courts, and Kentucky is no exception. That proposition, insofar as it goes, is true. But it ignores the fundamental holdings in *White*, 536 U.S. 765 at 771-782, 787-788, *Carey*, 614 F.3d 189 at 207-208, and *Winter*, 834 F.3d 681, 694-695, which presumed that the discussed issues *would come before the courts*. That fact was assumed and presumed by those Courts. But that fact was not enough to ignore the First Amendment. A disputed view of the law in a controversial area of the law is not enough to trigger the suppression of speech. *Id.* Quite the contrary, voters have a fundamental right to know where their judicial candidates stand on potentially disputed issues of law. Under *White*,

"[t]he greater power to dispense with elections altogether does not include the lesser power to conduct elections under conditions of state-imposed voter ignorance." 536 U.S. 765 at 788.

Rule 4.1(A)(13), as construed by Defendants, is, therefore, unconstitutional both facially and as-applied to Mr. Fischer's speech.

### 4. The remaining injunction factors favor entry of restraining order relief and preliminary injunctive relief

Having demonstrated a likelihood of success on the merits, the remaining factors collapse, including irreparable harm, *City of Detroit*, 568 F.3d 609 (abuse of discretion not to grant preliminary injunction where constitutional violation found); *Beshear*, 957 F.3d 610 (loss of First Amendment rights is irreparable); *Roberts*, 958 F.3d 409 (same); *Elrod*, 427 U.S. 347, 373 (same). That has been held to be the case in the context of unconstitutional judicial speech restrictions in the context of an in-process election as well. *Winter*, 56 F. Supp. 3d 884, 901.

And balance of harms and public interest likewise collapses when the government is the Defendant. *Martin-Marietta Corp.*, 690 F.2d 558, 568; *G & V Lounge*, 23 F.3d 1071, 1079; Winter, 56 F. Supp. 3d 884, 901. Courts have steadfastly held that "there is no public interest in enforcing a law that curtails debate and discussion regarding issues of political import." *Suster v. Marshall*, 149 F.3d 523, 533 (6th Cir. 1998) (*quoting Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley*, 454 U.S. 290, 299 (1981)).

An election is well underway for a seat on Kentucky's Supreme Court that will shape the direction of that Court for the next eight years. It will be concluded in the next 35 days. Allowing Defendants to stifle First Amendment protected speech in this context is irreparable – to Mr. Fischer – and to voters within Kentucky's Sixth Supreme Court District.

### 5.   A temporary restraining order should issue

We respectfully request emergency restraining order relief.  That restraining order relief should permit Mr. Fischer and his campaign clear sailing to engage in the following protected speech, which is otherwise being chilled by Defendants' threat of enforcement against Mr. Fischer, between now and the November 8, 2022 general election: (i) to permit him to truthfully say that he is "the conservative Republican;" (ii) to permit him to utilize the Republican party's elephant symbol to denote his affiliation with that party, JE 130 notwithstanding; (iii) to permit him to use and advertise his endorsements from Kentucky Right to Life and Northern Kentucky Right to Life; (iv) to permit general references to Mr. Fischer having served two decades in the Kentucky House of Representatives; (v) to permit Mr. Fischer to continue to indicate that he is committed to defending the rule of law and ensuring Kentucky's judicial system effectively serves all citizens of the Commonwealth, that he will not engage in judicial activism, and to continue to underscore his understanding of the importance of the separation of powers in that it is the duty and responsibility of the legislature to make the laws, the executive to enforce the laws, and the judiciary to interpret the laws; and (vi) to not require Mr. Fischer to disavow endorsements he has received from Republican Party executive committees.  (Compl., DE#1, at ¶58).

We also seek restraining order relief to preclude Defendants from initiating a formal complaint against him for this protected speech.  *Id.* at ¶59.  In part, that is to avoid the possibility of thorny abstention issues under *Younger v. Harris*, 401 U.S. 37 (1971), and to permit this Court the ability to adjudicate these claims.  That sort of "standstill" or "status quo" order is common and plainly warranted here.

### III.      CONCLUSION

Plaintiffs request for an emergency temporary restraining order and a preliminary

injunction should be granted.  Proposed orders are attached.

Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com

/s/Thomas B. Bruns
Thomas Bruns (KBA 84985)
Bruns, Connell, Vollmar & Armstrong, LLC
4555 Lake Forest Drive, Suite 330
Cincinnati, OH 45242
513-312-9890
tbruns@bcvalaw.com
*Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing by CM/ECF, this 5 day of October,

2022, will serve all parties by ordinary U.S. mail, and by electronic mail to Defendants' counsel

this same date.

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)