UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

| | |
|---|---|
| **JOSEPH FISCHER, ET AL.,** | **CIVIL ACTION NO. 2:22-121-KKC-EBA** |
| **Plaintiffs,** | |
| **V.** | **OPINION AND ORDER** |
| **HON. KAREN A. THOMAS, ET AL.,** | |
| **Defendants.** | |

*** *** ***

This matter is before the Court on the defendants' motion for summary judgment (DE 46) and on the motion for summary judgment and permanent injunction filed by Plaintiffs Joseph Fischer and Robert Winter (DE 47).

## I.    Background

The Sixth Circuit Court of Appeals has set forth the facts of this matter:

Joseph Fischer and Robert Winter were candidates in Kentucky's 2022 judicial elections. A few months before Election Day, the candidates received letters from the Kentucky Judicial Conduct Commission. According to the letters, the Commission had received complaints alleging that the candidates' campaign speech violated the Code of Judicial Conduct. The letters didn't specify which of the candidates' statements had prompted the complaints, but they did identify general issues. The letters faulted Fischer for identifying as "the nominee of the Republican Party" and faulted both candidates for "seeking, accepting, and using" endorsements from the Republican Party and making promises about abortion issues likely to come before the courts. R. 13-1, Pg. ID 118; R. 13-3, Pg. ID 123. The Commission asked the candidates to respond to the allegations and invited them to discuss their campaigns at a Commission meeting. The Commission would decide after the meeting whether to institute formal proceedings.

Rather than wait for the meeting, the candidates sued. Because the letters didn't specify which of the candidates' statements were problematic, the candidates guessed. Fischer had identified himself as "the Conservative Republican" and used a generic elephant logo

> in campaign advertising. R. 13, Pg. ID 100. Winter had called himself "conservative" and "a Republican." *Id.* Both candidates had used endorsements from pro-life groups, and both had received (but neither sought nor used) endorsements from local Republican Party committees.

*Fischer v. Thomas*, 78 F.4th 864, 866-67 (6th Cir. 2023)

The Commission's letter to Fischer explained that the complaints against him alleged he had violated three rules (DE 13-1) of the Kentucky Code of Judicial Conduct, which is found in Rule 4.300 of the Kentucky Supreme Court rules. Those rules generally prohibit any judge or judicial candidate from:

- "publicly identify[ing] himself or herself as a nominee of a political organization," Rule 4.1(A)6) (the "Nominee Rule");

- "seek[ing], accept[ing], or us[ing] endorsements from a political organization," Rule 4.1(A)(7) (the "Endorsement Rule"); and

- "in connection with cases, controversies, or issues that are likely to come before the court, mak[ing] pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office." Rule 4.1(A)(13) (the "Commitments Rule").

The Commission's letter asked for Fischer to respond in writing and invited him to participate in an informal conference to discuss the allegations. (R. 13-1 Fischer Letter.)

Regarding Winter, the Commission's letter to him stated that complaint made against him alleged that he had violated the Endorsement Rule and the Commitments Rule. As with Fischer, the Commission requested that he submit a written response and invited him to take part in an informal conference. (DE 13-3 Winter Letter.)

The letters did not, however, identify the speech that had potentially violated the rules cited.

Under Kentucky's Supreme Court rules, after receiving a complaint "indicating there is a basis for investigation of the matter," the Commission must conduct a preliminary investigation of a complaint to determine whether to initiate "formal proceedings." SCR 4.170(1). Thus, the Commission's letters to Plaintiffs indicate that the Commission determined there was "a basis for investigation" of the complaints against them to determine whether "formal proceedings" should be initiated. SCR 4.170(1).

The Commission states it never even commenced the preliminary investigation because this lawsuit was filed. (DE 46 Mem. 5; DE 41 Shaffer Tr. 36-37.) Thus, the Commission has never voted on whether "formal proceedings" are warranted, much less reached a decision on whether either Plaintiffs' speech violated the rules at issue. The complaints against Plaintiffs, however, remain pending at the Commission. (DE 41 Shaffer Tr. 36-37)

With this action, Plaintiffs ask the Court to declare that the Nominee Rule (Rule 4.1(A)(6)), the Endorsement Rule (Rule 4.1(A)(7)), and the Commitments Rule (Rule 4.1(A)(13)) violate the First Amendment both on their face and as applied to the speech identified in the complaint. (DE 13 Amended Complaint ¶¶ 56, 62.) They also ask for a permanent injunction enjoining the Commission from enforcing the rules against Plaintiffs for the speech identified in the complaint and from otherwise enforcing the rules. (DE 13 Amended Complaint ¶¶ 56, 62.)

Both parties move for summary judgment in their favor.

In response to the Commission's motion for summary judgment and in their motion for summary judgment, Plaintiffs raise a constitutional challenge to a fourth rule: Rule 4.1(A)(3), which prohibits a judicial candidate from publicly endorsing or opposing "a

3

candidate for any public office." Plaintiffs' complaint, however, asserts no as-applied or facial challenge to this rule. In fact, it does not mention the rule. Plaintiffs argue the Court can nonetheless determine the constitutionality of Rule 4.1(A)(3) at the summary judgment stage because notice pleading allows that.

"The Federal Rules of Civil Procedure . . . provide for liberal notice pleading at the outset of the litigation." *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). Thus, when resolving a motion to dismiss, the Court is governed by the liberal notice-pleading requirements. *Id.* Here, however, the parties have completed discovery, and this case is before the Court on summary judgment motions. The pleading standards are now "inapplicable." *Id.* Plaintiffs argue that their deposition of the Commission's executive secretary revealed a new claim challenging Rule 4.1(A)(3). If so, then they could have moved to amend the complaint to add the claim. *Id.* They did not.

Allowing Plaintiffs to proceed now on a challenge to Rule 4.1(A)(3) would subject the Commission to "unfair surprise." *Id.* It had no notice that Plaintiffs would be asserting any such challenge. Accordingly, the Court will not address the late challenge to Rule 4.1(A)(3).

## II.    Analysis

Plaintiffs argue that each of the three rules (the Nominee Rule, the Endorsement Rule, and the Commitments Rule) is facially unconstitutional and is unconstitutional as it has been applied to the speech identified in the complaint.

"A facial challenge to a law's constitutionality is an effort 'to invalidate the law in each of its applications, to take the law off the books completely.'" *Speet v. Schuette*, 726 F.3d 867, 871–72 (6th Cir. 2013) (quoting *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir.2009)). Thus, "[s]ustaining a facial attack to the constitutionality of a state

4

law . . . is momentous and consequential. It is an 'exceptional remedy.'" *Id*. at 872 (quoting *Carey v. Wolnitzek*, 614 F.3d 189, 201 (6th Cir.2010)).

An as-applied challenge, on the other hand, argues that a law is unconstitutional only as it has been enforced against the plaintiffs. *Id*. "While a facial challenge invokes the rights of others, an as-applied challenge is confined to the particular circumstance of the plaintiff." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 570 (6th Cir. 2012). This is one reason why the "usual judicial practice" is to address the as-applied challenge to a statute before the facial challenge. *Id*. "Although the occasional case requires us to entertain a facial challenge in order to vindicate a party's right not to be bound by an unconstitutional statute, we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." *Id*. (quoting *United States v. Treasury Employees*, 513 U.S. 454, 477–78 (1994)).

This sequencing is generally desirable because "it decreases the odds that facial attacks will be addressed 'unnecessarily' and because this approach avoids encouraging 'gratuitous wholesale attacks upon state and federal laws.'" *Connection Distrib. Co.*, 557 F.3d at 327–28 (quoting *Bd. of Trs. of the State Univ. of N.Y. v Fox*, 492 U.S. 469, 484-85 (1989)). It is unnecessary for a court to address a facial attack on a statute if it has determined that the statute was not validly applied to the plaintiffs. *Bd. of Trs. of the State Univ. of N.Y.*, 492 U.S. at 484-85. "Thus, for reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first." *Id*. at 485.

Accordingly, the Court will first address Plaintiffs' as-applied challenges to the rules. If the Court determines that any rule does not survive the as-applied challenge, then it need not address the facial validity of that rule. *See Ohio Citizen Action*, 671 F.3d

at 571 ("We do not address the facial validity of Englewood's curfew provision because we conclude that it cannot survive OCA's as-applied challenge.")

### A.    Standing and Mootness

The Commission asserts that the Court should not decide Plaintiffs' as-applied challenges to the rules at all. It asserts that Plaintiffs filed this lawsuit before it could complete its preliminary investigation, determine whether formal proceedings against Plaintiffs are warranted, or reach an official decision on whether the rules should be applied to prohibit the speech that Winter and Fischer engaged in. (DE 46 Mem. 5-6, 15.) Thus, the Commission argues, Plaintiffs have not demonstrated that the threatened enforcement of the rules is "sufficiently concrete and imminent" and any court ruling on the as-applied claims would be an "impermissible advisory opinion." (DE 46 Mem. 15.)

"The requirements of standing, ripeness, and mootness guard against the issuing of advisory opinions." *State of Ohio ex rel. Celebrezze v. United States Dep't of Transp.*, 766 F.2d 228, 232 (6th Cir.1985).

Standing, however, is determined at the time the complaint is filed. *Patton v. Fitzhugh*, No. 24-5639, 2025 WL 798959, at *4 (6th Cir. Mar. 13, 2025). It "does not have to be maintained throughout all stages of litigation." *Id*. The Sixth Circuit has already determined Plaintiffs had standing to assert their as-applied claims. *Fischer v. Thomas*, 52 F.4th 303, 307-09. (6th Cir. 2022).

As to ripeness, whether a First Amendment challenge is facial or as applied, the question on standing and ripeness is the same: "Have [the plaintiffs] established a credible threat of enforcement?" *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016). The Sixth Circuit addressed that precise question in this case and determined that the answer was "yes." *Fischer*, 52 F.4th at 307-09. In its briefs before this Court, the Commission argues that the Court should not consider the as-applied challenges because

6

the Commission has not completed its investigation or reached any decision on whether Plaintiffs violated the rule. This was all true at the time of the Sixth Circuit's ruling that explicitly found Plaintiffs face a credible threat of enforcement.

Since that ruling, however, the November 2022 election occurred, and neither plaintiff won. Events occurring after the filing of a complaint cannot deprive the plaintiff of standing, but they can "create 'mootness' issues and trigger that doctrine's more forgiving rules." *Patton*, 2025 WL 798959, at *4 (quoting *Fox v. Saginaw Cnty., Michigan*, 67 F.4th 284, 295 (6th Cir. 2023)). The Commission does not explicitly argue that the as-applied claims are moot, but they do assert that Plaintiffs are requesting an advisory opinion, which may implicate mootness. Regardless, mootness is a jurisdictional issue that the Court may raise *sua sponte*. *Fouts v. Warren City Council*, 97 F.4th 459, 464 (6th Cir. 2024).

Events that occur after the filing of a complaint may render a claim moot if it means "the issues presented are no longer 'live' or parties lack a legally cognizable interest in the outcome." *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 781 (6th Cir.2007) (citation omitted).

Here, however, Plaintiffs remain under investigation by the Commission for the speech they engaged in during the campaign. (DE 41 Shaffer Tr. 36-37.) The complaints against Plaintiffs remain pending and at the preliminary investigation phase. (*Id.*) The Commission makes clear it may still initiate formal proceedings against Plaintiffs for violations of each of the rules. (DE 50 Reply 5-6.)

Moreover, a claim is not moot "when the state action at issue is capable of repetition, but yet in the instant matter evades review." *Briggs v. Ohio Elections Comm'n*, 61 F.3d 487, 492 (6th Cir. 1995). In *Briggs*, the court determined that the candidate's as-applied claim under the First Amendment was not moot because "[s]he has stated she

plans to run for state office again, and the Commission has stated that it shall consider its finding against Briggs if a subsequent complaint is made against her." 61 F.3d 492-93. Thus, the court determined, Briggs faced "a reasonable likelihood that she will again suffer the injury that gave rise to this suit." *Id* at 493.

Here, Plaintiffs explicitly alleged that they intend to "run for judicial office again, and again engage in the same speech" outlined in the complaint in this action. (DE 13 Amended Complaint ¶ 38.) They repeated this intent in their depositions. (DE 42 Winter Dep. 60; DE 43 Fischer Dep. 67.)

In the briefs before this Court, the Commission states it will not "unequivocally disavow[]" enforcing the rules against Plaintiffs. (DE 46 Mem. 17, 20, 22.)  Instead, the Commission represents that "Formal Proceedings" against Plaintiffs "may be warranted" if the preliminary investigation yields evidence that Plaintiffs violate any of the rules. (DE 46 Mem. 17, 20, 22.) Accordingly, Plaintiffs' as-applied claims were not mooted after the November 2022 election.

Moreover, the Sixth Circuit has already addressed mootness in this case, finding that Plaintiffs' request for a preliminary injunction was not moot even after the election "[b]ecause the Commission can still investigate speech the former candidates made during their candidacies." *Fischer v. Thomas*, 78 F.4th 864, 867 (6th Cir. 2023). The court noted that under the state Supreme Court Rules, "[e]ven after Election Day, the Commission can initiate formal proceedings for conduct occurring during a judicial candidacy." *Id.* at 868 (citing SCR 4.025(1)); *see also Carey*, 614 F3d at 197 (finding claim was not moot after election passed because plaintiff retained the right to run for judicial office again.)

Accordingly, Plaintiffs' as-applied claims are not moot.

B.    **The Contested Speech**

As to the merits, the first issue on the as-applied claim is whether the speech that the candidates engaged in and intend to engage in again is protected by the First Amendment. *Briggs,* 61 F.3d at 494. But before resolving that, the Court must determine precisely what speech is at issue. That is more difficult to determine in this case than others because, as discussed, the Commission has not yet found that any speech by the candidates is prohibited by the rules. Further, the Commission's letters to Plaintiffs did not identify the problematic speech. Moreover, it is not clear from the parties' briefing whether the parties even agree on what speech is at issue.

In its briefs, the Commission does not identify any speech that it intends to prohibit at this point, but, as discussed, it does not rule out instituting formal proceedings against Plaintiffs to enforce the rules.

In pinpointing the speech that Plaintiffs wish to engage in that they believe the Commission has threatened to prohibit, the Court will stick to the allegations in the complaint and the relief requested in the complaint. In the complaint, Plaintiffs alleges that the candidates engaged in the following speech during the campaign and that that they believe this was the speech the Commission referenced in its letters to them:

1)   Fischer used the following image



(DE 13 Complaint ¶¶ 14, 26);

2)  Winter advertised that he is a "conservative" and told voters that he is "a
Republican" (DE 13 Complaint ¶¶ 14, 34);

3)  Fischer and Winter obtained and used in campaign materials endorsements by
Kentucky Right to Life and Northern Kentucky Right to Life (DE 13 Complaint
¶¶ 16, 30, 36);

4)  Kentucky Right to Life and Northern Kentucky Right affixed their own signs
stating "Choose Life" to the candidates' campaign signs and displayed the signs
as shown below:



(DE 13 Complaint ¶¶ 18, 19, 30, 36); and

5)  Fischer and Winter failed to disavow endorsements they received from various
county Republican Party Executive Committees. (DE 13 ¶ 23, 28, 34.)

This largely mirrors the speech that the Sixth Circuit determined to be at issue in
this case. *Fischer*, 52 F.4th at 313. And in their briefing on the summary judgment
motions, the Plaintiffs confirm that this is the speech that forms the basis for their First
Amendment claims. (DE 47 Mem. 2-5; DE 49 Responses 1-3.)

10

The Commission does not argue that any of this speech is not protected by the First Amendment. Speech during an election campaign "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995). "As we have long recognized, speech about public issues and the qualifications of candidates for elected office commands the highest level of First Amendment protection." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 443 (2015). Thus, the speech at issue here is protected by the First Amendment.

The Court must next determine if the Commission has sufficiently justified restricting the speech. The parties agree that the proper test to determine the constitutionality of the rules, as applied to Plaintiffs' speech, is "strict scrutiny." The Supreme Court has made this clear. *Williams-Yulee*, 575 U.S. at 444 ("In sum, we hold today what we assumed in *White* : A State may restrict the speech of a judicial candidate only if the restriction is narrowly tailored to serve a compelling interest.") Under strict scrutiny analysis, the government may restrict speech if it shows that the restriction is "(1) narrowly tailored, to serve (2) a compelling state interest." *Republican Party of Minn. v. White,* 536 U.S. 765, 774–75 (2002).

## C. The Application of the Rules

The Court will begin with the statements that may implicate the Nominee Rule, which prohibits a judicial candidate from "publicly identify[ing] himself or herself as a nominee of a political organization." Rule 4.1(A)6). These statements are Fischer's use of the above image identifying himself as "the Conservative Republican" candidate and Winter's statements that he is a "conservative" and a "Republican." The Commission indicates in its briefing on the motions for summary judgment that this is the speech for which Fischer is under investigation for possible violations of the Nominee Rule. (DE 46 Mem. 17; DE 48 Response 4-5.)

11

The Commission must show a compelling interest in restricting this speech and it must show that the restriction is narrowly tailored to serve that interest. "Kentucky has a right to prevent candidates from identifying themselves as *the* nominee of a political party for a judicial seat. That's because Kentucky runs its judicial elections on a nonpartisan basis." *Winter*, 834 F.3d at 688. In determining whether restricting the speech at issue here is narrowly tailored to serve that compelling interest, the Sixth Circuit's discussion of the speech in this case is instructive:

> As we have already held, "candidates have a constitutional right to portray themselves as a member of a political party." *Winter*, 834 F.3d at 688. And these statements and logos do no more than that.
>
> Let's go line by line. There's no problem with the candidates identifying themselves as "conservative." Candidates may tell voters what they think about the issues of the day, including the size of government and social issues. *Carey v. Wolnitzek*, 614 F.3d 189, 201 (6th Cir. 2010) (discussing *Republican Party of Minn. v. White*, 536 U.S. 765 (2002)). Or they may use "shorthand" to communicate "their views on many issues at once." *Id.* at 202 (emphasis omitted). So "conservative" is no problem. Nor is identifying themselves as Republican. *Winter*, 834 F.3d at 688. And since the First Amendment protects each alone, there's no problem with using them together.
>
> Adding the definite article "the" likely doesn't change the analysis. True, Fischer's logo identifies him as "*the* conservative Republican." But simply adding "the" to "conservative Republican" does not imply that he's received the party's nomination. *See, e.g., id.* at 689. Just as plausibly, the statement implies that there is more than one Republican in the race (rather than just one official "nominee") because it suggests that Fischer is more conservative than other Republican candidates. Since claiming the mantle of the "conservative" Republican is not the same as claiming to be the party's nominee, the First Amendment likely covers this speech too.
>
> Nor does use of the elephant imply that Fischer is the nominee. First, the elephant Fischer uses isn't even the Republican Party's elephant. So it's hard to see how the "general elephant" on his sign equals an endorsement from the Republican Party.

12

> Second, if Fischer's elephant violates Rule 4.1(A)(7), what
> doesn't? What if Fischer put a picture of himself riding an
> elephant? Or a donkey dancing with an elephant? Simply put,
> the First Amendment doesn't allow the Commission to ban
> animal symbols just because they happen to be closely
> associated with political parties.

*Fischer*, 52 F.4th at 311.

For these reasons, prohibiting judicial candidates from stating that they are a conservative or a Republican or "*the* Conservative Republican" does not serve the state's interest in prohibiting judicial candidates from publicly identifying as a political party's nominee. The statements do not assert or imply that the candidates received the party's nomination.

Accordingly, the Nominee Rule is unconstitutional as applied to restrict Fischer's use of the above image identifying himself as "the Conservative Republican" in the race and to restrict Winter from advertising that he is a "conservative" and identifying himself as a "Republican."

Next, are the statements that may implicate the Endorsement Rule, which prohibits a judicial candidate from seeking, accepting or using endorsements from a "political organization." Rule 4.1(A)(7). Before the Sixth Circuit and this Court, Plaintiffs have argued that the speech restricted by the Commission's application of this rule is their failure to disavow endorsements they received from various Republican Party Executive Committees and elected officials. *Fischer*, 52 F.4th at 311-12; (DE 13 Complaint ¶ 28.). The comment to the Endorsement Rule explicitly states, however, that a "judicial candidate is not required to disavow an endorsement to avoid being deemed to have accepted it." *See* Rule 4.1 cmt. 10. And the Commission states it does not interpret the rule to require that a candidate disavow an endorsement. (DE 46 Mem. 19.)

13

Thus, the Commission has not unconstitutionally applied the Endorsement Rule to these Plaintiffs for their failure to disavow endorsements they received from various Republican Party Executive Committees. The Commission does not apply the rule to this speech at all.

Having determined that Plaintiffs' as-applied challenge to the Endorsement Rule fails, the Court will address the facial challenge to the rule.

The Sixth Circuit has recognized that Kentucky has a compelling interest in "preventing judges from becoming (or being perceived as becoming) part of partisan political machines" and "keeping its judges above the partisan fray of trading political favors." *Winter*, 834 F.3d at 691. And, as discussed, the Sixth Circuit has also recognized that the state "has a right to prevent candidates from identifying themselves as *the* nominee of a political party for a judicial seat," *Id*. at 689, because the Kentucky Constitution mandates that judicial candidates be elected "on a nonpartisan basis." Ky. Const. § 117.

In the comments to the Endorsement Rule, the Commission states that the rule serves all these interests. According to the comments, the danger of political party endorsements in a campaign is that "[a] political organization's endorsement of a candidate is but slightly removed from the judge or candidate's nomination as the political organization's official candidate." SCR 4.1 cmt 10. The comment recognizes that candidates can announce their party affiliation but states that allowing them to seek, accept, or use endorsements of political organizations would "render hollow the right of citizens of the Commonwealth to vote for their judges in nonpartisan elections." *Id*. (internal quotations and citation omitted).

The Ninth Circuit determined an essentially identical rule in Montana served the state's compelling interest in "actual and perceived judicial impartiality." *French v. Jones*,

876 F.3d 1228, 1237, 1238 (9th Cir. 2017). This is because of "the regrettable but unavoidable consequence that judges who personally ask for political endorsements may diminish the public's faith in the impartiality of the judiciary, whether a judge's actual impartiality is affected or not." *Id*. at 1237. "Seeking and using political endorsements may create the appearance that a judge will favor certain politicians or political parties and thereby 'undermine the public's confidence that judges base rulings on law, and not on party affiliation.'" *Id*. (quoting *Wolfson v. Concannon*, 811 F.3d 1176, 1183, 1186 (9th Cir. 2016)).

> An endorsement is a thing of value: it may attract voters' attention, jumpstart a campaign, give assurance that the candidate has been vetted, or provide legitimacy to an unknown candidate and indicate that he or she is capable of mounting a successful campaign. Such things of value are usually not given out for free, and even when they are, the mere *perception* of quid pro quo in judicial campaigns might undermine the public's trust in the impartiality and independence of its judiciary."

*Id*. at 1240.

The Ninth Circuit determined that the ban on seeking and using endorsements also served the state's interest in a "structurally independent judiciary." *Id*. at 1237. This is because, "[i]f judicial candidates, including sitting judges running for reelection, regularly solicit and use endorsements from political parties, the public might view the judiciary as indebted to, dependent on, and in the end not different from the political branches." *Id*. at 1237-38.

Plaintiffs acknowledge precedent establishing that Kentucky has a compelling interest "in non-partisan elections, and in the prevention of quid pro quo corruption." (DE 49 Response 21.) They further acknowledge that, to serve these compelling interests, the Commission could constitutionally prohibit candidates from "expressly using endorsements from a political party." (*Id*.) They argue, however, that the rule is vague, an

15

issue not raised in *French*. Citing the deposition testimony of the Commission's executive secretary, Plaintiffs assert that the Commission construes the Endorsement Rule to prohibit a judicial candidate from stating that a group of elected officials are hosting a fundraiser for him and from publicly thanking a political party for a donation.

A law is vague if it "fails to provide fair notice to those to whom it is directed." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048 (1991) (cleaned up and citation omitted). A law provides fair notice if it "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)). The law must provide "explicit standards" to prevent "arbitrary and discriminatory applications." *Id*.

One problem with the Endorsement Rule is the very word "endorsement." The Commission itself does not have a settled definition of the term. Meriam-Webster's Online Dictionary defines "endorsement" to include "sanction" or "approval." https://www.merriam-webster.com/dictionary/endorsement. It also, however, defines the term as "something that is written in the process of endorsing." *Id*. Citing this definition, the Commission states in its motion for summary judgment that "endorsement" means a "public, written statement of express support or approval." (DE 46 Mem. 19.)

Nevertheless, the Commission also states that a comment by Fischer on Facebook thanking the Oldham County Republican Party Executive Committee for its "generous support" of his campaign "suggests" that Fischer used an endorsement from the party. (DE 46 Mem. 19; DE 43-4). A response to the Facebook post posted by the county party chairman indicates that the support was not a "public, written statement of express support or approval" but instead "financial support." Fischer confirmed that during his deposition. (DE 43 Fischer Dep. 46-47.)

16

This discussion during the deposition prompted an exchange as to what the term "endorsement" means. Fischer stated he did not believe that an endorsement included a financial contribution. (DE 43 Fischer Dep. 47.) In her deposition, however, the Commission's executive secretary was uncertain as to whether a candidate violates the Endorsement Rule by publicly thanking a political organization for its financial support. (DE 41 Shaffer Dep. 52.) Any person of ordinary intelligence would have the same uncertainty.

In its motion, the Commission cites as problematic under the Endorsement Rule certain of Plaintiffs' "public interactions with various county Republican parties" that it finds "suggest actual solicitation and use" of the parties' endorsements. (DE 46 Mem. 20.) In its response brief, the Commission identifies these interactions as those set forth in a memorandum by its executive secretary, which describes the following posts on the Fischer campaign Facebook page. (DE 48 Response 5 (citing DE 41-9 Shaffer Tr. Ex. 9.)):

- an invitation by numerous Kentucky Republican politicians to a reception supporting Fischer;
- the comment thanking the Oldham County Republican Party for supporting Fischer's campaign;
- a picture of Fischer with Kentucky Republican Senator Mitch McConnell at a reception held for McConnell by the Kentucky County Republican Women's Club;
- photos of Fischer with a Republican elected official and a state senate candidate at an event held by the Owen County Republican party;
- photos from a Fischer campaign event hosted by Republican elected officials;
- a video of Kentucky Republican U.S. Representative Thomas Massie endorsing Fischer stating that "we need Joe Fischer on the Kentucky Supreme Court to stop the Supreme Court from overturning actions taken by the legislature";
- a photo of Fischer with Agriculture Commissioner and Republican Candidate for Governor Ryan Quarles;
- a comment thanking certain state representatives for supporting Fischer's campaign;

17

- a post thanking certain Republican elected officials for their "kind words" and the Shelby County Republican Party for hosting a dinner; and
- a photo of Fischer with the vice chairperson of the Shelby County Republican Party.

(DE 41-9 Summary.)

None of these posts involve a "public, written statement of express support or approval" of Fischer by a political organization. The Commission citing this speech as problematic further confuses what the term "endorsement" means.

Another problem is the word "seek." The code does not define it. Merriam-Webster says it means "to ask for" or to "try to acquire" something. https://www.merriam-webster.com/dictionary/seek. The Endorsement Rule clearly prohibits a candidate from directly requesting an endorsement from a political organization. But the code uses the term, "personally solicit" for a "direct request" made by a judicial candidate. SCR 4.300, Terminology; Rule 4.1(A)(8). Thus, by employing the term "seek," the Endorsement Rule must prohibit more speech than a "direct request." It is just not clear what that speech is. Perhaps the rule would prohibit a candidate from even appearing before a political organization to announce his views, because such speech may be viewed as "trying to acquire" the organization's endorsement.

As to the word, "accept," the code does not define this term either. Merriam-Webster provides that to accept something is to "receive (something offered) willingly." https://www.merriam-webster.com/dictionary/accept. As discussed, the comments to the Endorsement Rule clarify that a candidate "is not required to disavow an endorsement to avoid being deemed to have accepted it." Rule 4.1, comt. 10. But it is not clear what actions a candidate must take short of disavowal to avoid being deemed to have

"accepted" a political organization's endorsement, which the Commission indicates may even include a financial contribution.

Because an ordinary person would not understand what speech the Endorsement Rule prohibits, the rule is unconstitutionally vague.

Finally, the Court addresses the speech outlined in the complaint that may implicate the Commitments Rule. That Rule prohibits candidates from making "pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office" if those pledges, promises, or commitments are "in connection with cases, controversies, or issues that are likely to come before the court." Rule 4.1(A)(13).

In its motion, the Commission indicates that the speech outlined in the complaint that may be problematic under the Commitments Rule is the "Choose Life" signs that were affixed to the candidates' campaign signs as depicted above. (DE 46 Mem. 20.) Plaintiffs state that neither they nor their campaigns erected the "Choose Life" signs or affixed them to their campaign signs. Instead "third party Right to Life groups" did it. (DE 13 Complaint ¶ 19.) The Commission offers no evidence to the contrary. To the extent that the Commission seeks to apply the Commitments Clause to sanction the candidates for speech by third parties, it offers no compelling reason for doing so. Any such application would be unconstitutional.

But even if Plaintiffs posted the Choose Life signs themselves, the Commission would have no compelling reason for restricting that speech. The Commission has a compelling interest in "prohibiting candidates from promising to rule a certain way on cases." *Carey*, 614 F.3d at 207. But telling the public to "Choose Life" is not a promise to rule a certain way on a case. It is an announcement of a view on a controversial issue. The state has no compelling interest in prohibiting such announcements. "Candidates may tell

voters what they think about the issues of the day, including the size of government and social issues." *Fischer*, 52 F.4th at 311 (citing, 614 F.3d at 201). A "canon of judicial conduct prohibiting candidates for judicial election from announcing their views on disputed legal and political issues violates the First Amendment." *White*, 536 U.S. at 788.

The Commission also points to a Facebook post by Fischer in which he thanked "Justice Alito and the courageous pro-life majority on the Court for their clear and well-reasoned opinion" overturning *Roe v. Wade*. He also stated:

> Because of the work of our pro-life majority in the General Assembly, Kentucky is now positioned to preserve, protect and defend the inalienable right-to-life for all persons from conception to natural death.
>
> With the passage of HB 148 in the 2018 session, the General Assembly triggered an immediate ban on abortions (except when necessary to save the mother's life) if and when the U.S Supreme Court overturned Roe v. Wade. That mission was accomplished today. Praise be to God!
>
> With the passage of HB 2 during the 2021 session, the General Assembly gave the Attorney General full authority to enforce our pro-life laws in the event local prosecutors or the Governor failed to do so. That goal was accomplished today when the Attorney General issued his advisory opinion.
>
> And finally, with the passage of the Yes for Life Amendment 2 on November 8, 2022, the people of Kentucky will ensure generations of Kentucky children that their lives will be protected by the Kentucky Constitution.
>
> To God be the Glory!

(DE 46 Mem 20; 43-3 Fischer Facebook Post.)

Pursuant to precedent, however this post does not constitute a promise, pledge or commitment to rule a certain way on a case. It is an announcement of Fischer's view of a Supreme Court decision and of actions taken by the General Assembly. Pursuant to *White*, the state has no compelling interest in prohibiting such announcements.

The Sixth Circuit has determined that such announcements do not jeopardize an "open-minded" judiciary or the appearance of the same because it does not indicate a bias against one of the parties. *Fischer*, 52 F.4th at 312 (quoting with approval a Fischer Facebook post.) A sincerely held moral belief does "not create a legal impediment to the judge applying the facts of the case to the text of the law and imposing appropriate punishment" because "t]he hallmark of impartiality and the rule of law is the judge's commitment to put aside their personal opinions about political issues and decide each individual case based on the law as written." *Id*.

Finally, the Commission discusses the Plaintiffs' use during their campaigns of endorsements by Right to Life organizations. (DE 46 Mem. 22.) The Commission indicates it will not apply the Commitments Clause to restrict this language absent evidence that Fischer or Winter pledged to rule favorably for the groups. (DE 46 Mem. 22.) Plaintiffs' simple use of the endorsements during their campaigns is not a pledge, promise, or commitment to rule a certain way on a case. It may indicate a candidate's view on abortion, but as discussed, the Commission has no compelling interest in prohibiting such announcements.

Accordingly, the Court has determined that Plaintiffs have suffered certain violations of their First Amendment rights to free speech. "A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law." *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 249 (6th Cir. 2011) (quoting *Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*, 610 F.3d 340, 349 (6th Cir.2010). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Moreover, the parties have stipulated that, due to Eleventh Amendment, judicial, and prosecutorial immunities, Plaintiffs

cannot obtain money damages in this action. (DE 38 Stipulation), meaning any monetary losses would be irreparable. *See Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

Accordingly, the Court herby ORDERS as follows:

1) Plaintiffs' motion for summary judgment (DE 47) is GRANTED as follows:

    a. Judgment is entered in favor of Plaintiffs on their as-applied challenges to the Nominee Rule and Commitments Rule and the Commission is ENJOINED from taking any action, including initiating formal proceedings against Plaintiffs, for the following speech:

        i. Fischer's use of the following image and statements:



        ii. Winter's statements that he is a "conservative" and a "Republican";

        iii. Kentucky Right to Life and Northern Kentucky Right to Life affixing their own signs stating "Choose Life" to Plaintiffs' campaign signs; and

        iv. the Plaintiffs' use of endorsements by Kentucky Right to Life and Northern Kentucky Right to Life;

    b. Judgment is entered in Plaintiffs' favor on their facial challenge to the Endorsement Rule; and

    c. The Commission is enjoined from enforcing the Endorsement Rule; and

2)   The Commission's motion for summary judgment (DE 46) is DENIED.

This 31st day of March, 2025.


KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY